UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Morris L. Stanley,

        Plaintiff

v.

BP Products North America, Inc.,

        Defendant

Case No. 15-cv-2347

MEMORANDUM OPINION

## I. INTRODUCTION

Before me are: (1) Defendant BP Products North America Inc.'s motion for summary judgment, (Doc. No. 22), with opposition by Plaintiff, (Doc. No. 26), and reply by Defendant, (Doc. No. 29); (2) Defendant's motion to strike inadmissible evidence submitted with Plaintiff's Opposition to Defendant's motion for summary judgment, (Doc. No. 28), with opposition by Plaintiff, (Doc. No. 30), and reply by Defendant, (Doc. No. 32); and (3) Plaintiff's motion to strike issues newly raised in reply, (Doc. No. 31), with opposition by Defendant. (Doc. No. 33).

## II. BACKGROUND

In 1976, Plaintiff Morris Stanley began working for Defendant BP Products North America Inc. ("BPPNA") at its Oregon, Ohio oil refinery. (Doc. No. 34 at 6). On November 10, 2010, Stanley suffered a stroke while at work. (Doc. No. 11 at 2, Doc. No. 34 at 16). At the time, Stanley was working as an operator in the Oil Movement and Storage department. (Doc. No. 34 at 6). The position required Stanley to perform tasks such as pulling, turning, lifting, climbing on tanks, and driving on and off of refinery property. *Id.* at 7-8. Because Stanley could "hardly talk," had limited mobility on his right side, and could not drive after the stroke, he was not able to return to work immediately. *Id.* at 16.

Over the course of nearly a year, Dr. Thomas Smallwood, M.D., Stanley's primary care physician, examined Stanley at least every other month. *Id.* at 16-17. Stanley was also treated by various therapists to aid in his rehabilitation. *Id.* at 17. During this time, Stanley received short-term disability benefits for 26 weeks and used FMLA leave. *Id.* at 17-18. Stanley also applied for long-term disability benefits, but due to Dr. Smallwood's office's failure to provide the requisite medical evidence, the application was denied in July 2011. *Id.* at 19-20. At the time, it was Stanley's understanding that the application would be reviewed again after receipt of the requisite documents. *Id.* at 20.

After the long-term disability application was denied, Stanley visited Dr. Smallwood's office for an opinion on his ability to return to work. *Id.* Dr. Smallwood did not release Stanley to return to work during an appointment in early August. *Id.* But later that month, the nurse practitioner working in Dr. Smallwood's office, Angela Scardina, performed a physical exam of Stanley and issued a return-to-work slip on August 9, 2011. (Doc. No. 22-3 at 24; Doc. No. 34 at 20-21, Doc. No. 37 at 9).

Pursuant to the terms of the labor agreement governing Stanley's employment between the Steelworkers union and BPPNA, Stanley produced the return-to work slip to BPPNA. (Doc. No 34 at 12, 21-22). Under the agreement, "An employee absent due to any cause for a period of ninety days or more during any continuous twelve-month period must be examined at Company expense by a doctor designated by the Company to determine whether he is capable of returning to work." (Doc. No. 22-1 at 28). The agreement also provides,

> If an employee is dissatisfied with the Company physician's opinion of the employee's physical examination, he may have his physician consult with the Company's physician in an effort to resolve the difference. Should either of the two physicians deem it necessary, they shall within 10 days call in a specialist acceptable to both physicians for further consultation and/or examination for the purpose of helping to arrive at a decision in the case.

*Id.* Such was the case here.

BPPNA contracts Dr. James Brue, M.D. to perform various medical tasks at the oil refinery including return to work evaluations. (Doc. No. 36 at 6). Dr. Brue is board certified in occupational medicine and has been practicing in the field since 1989. *Id.* at 4-5. He is regularly contracted by companies to perform return to work evaluations, such as the one he performed on Stanley when Stanley presented Nurse Practitioner Scardina's return-to-work slip. *Id.* at 6-7, 14-15. Describing Stanley's return to work evaluation, Dr. Brue stated:

> I performed a series of neurological tests appropriate for someone who was returning from a stroke. Obviously injury to the brain can cause both cognitive, as well as musculoskeletal, motor sensory deficits. So the purpose of the examination was to try to evaluate all of those areas in relationship to a stroke, and then determine if it applies to his abilities to perform his job duties.

(Doc. No. 36 at 15). Based on personal observation, Dr. Brue found Stanley to have "definite issues as far as balance, coordination and loss of fine motor skills", as well as "some psychomotor deficits as well as cognitive deficit." (Doc. No. 22-3 at 21).

Before making a final recommendation, Dr. Brue reviewed Stanley's other medical records in an effort to fully assess Stanley's condition at the time. (Doc. No. 22-3 at 18-20). Upon review of Nurse Practitioner Scardina's notes taken during her most recent evaluation of Stanley, Dr. Brue found that she had not performed "any cognitive or neuro psych evaluation" during the exam. *Id.* at 20. He also cited discrepancies between her finding and his personal observations, specifically her finding that Stanley had "normal balance." *Id.* Relatedly, Dr. Brue opined that she did not have knowledge of Stanley's job duties as she said Stanley wanted to return to work in a "'factory operating valves.'". *Id.* at 19-20.

Although Dr. Brue attempted to contact Dr. Smallwood's office to resolve the discrepancy between his findings and that of Nurse Practitioner Scardina, Dr. Smallwood's office did not respond. (Doc. No. 22-3 at 18). Therefore, based on the information available, Dr. Brue recommended certain work restrictions that would limit Stanley to sedentary office work. (Doc. No.

3

22-3 at 18-19, 25). At the time, BPPNA did not have a position available that could accommodate these restrictions.

Without sedentary work available or information from Dr. Smallwood's office required by the insurance company to verify the need for long-term disability, Stanley was "low on cash." (Doc. No. 34 at 27; Doc. No. 38 at 6-7). After learning of Stanley's financial hardships, Steve Rodzos, a BPPNA employee and union chairman at the time, contacted Dr. Smallwood's office to solicit

> a statement from Smallwood to Brue that would convince Brue [Stanley] could go back to work and make a living, or, B, Smallwood agrees that Brue's correct and [Stanley] cannot go back to work and he makes money through LTD [long-term disability].

(Doc. No. 38 at 7). Rodzos stated he did not care whether Dr. Smallwood recommended returning to work or being placed on long-term disability, so long as the result was that Stanley would start getting paid. *Id.*

In response, Dr. Smallwood faxed a letter to BPPNA on November 1, 2011, corroborating Dr. Brue's recommended work restrictions and recommending long-term disability. (Doc. No. 22-4 at 18, Doc. No. 37 at 12). To inform his judgment, Dr. Smallwood did not personally examine Stanley to reach his conclusion, but instead reviewed the existing medical records, including the notes from Nurse Practitioner Scardina's previous exam. (Doc. No. 37 at 12).

Following receipt of Dr. Smallwood's letter, Stanley was approved for long-term disability. (Doc. No. 34 at 27). But Stanley refused to cash the checks, maintaining that he was capable of returning to work at that time. *Id.* Stanley did not return to work until August 2012, after being reexamined by Dr. Brue and cleared to return to work. *Id.* at 32-34. Because of the delay in releasing him to return to work, Stanley filed suit against BPPNA asserting claims of race and disability discrimination under Ohio law.

### III. MOTION TO STRIKE

Attached to Stanley's opposition to BPPNA's motion for summary judgment are the following documents: (1) "Appendix A – Affidavit of Morris L. Stanley and Exhibits," (Doc. No. 26-1); (2) "Appendix B – Affidavit of Laurie Sharp and Exhibits," (Doc. No. 26-2); and (3) "Appendix C – Affidavit of Mark Lowry and Exhibits." (Doc. No. 26-3). BPPNA moves to strike these document in whole or in part. (Doc. No. 28).

After evaluating the briefs related to summary judgment, I find the only evidence relevant to the issues in dispute is the driving assessment conducted by a University of Toledo Medical Center therapist. BPPNA moves to strike the driving assessment on grounds of hearsay and authentication. (Doc. No. 28 at 15-17). In response, Stanley asserts that the driving assessment is introduced solely to impeach Dr. Brue, not prove the truth of the matters asserted therein. (Doc. No. 30 at 14 -15). Essentially, Stanley argues that the driving assessment may be admitted for the purpose of impeachment by contradiction.

But Stanley fails to acknowledge that the Sixth Circuit "ha[s] not recognized the doctrine of impeachment by contradiction," "an exception to Federal Rule of Evidence 608(b)'s collateral fact rule, 'which generally prohibits the introduction of extrinsic evidence to attack the credibility of a witness.'" *United States v. Scott*, 693 F.3d 715, 721-22 (6th Cir. 2012) (quoting *United States v. Kincaid-Chauncey*, 556 F.3d 923, 932 (9th Cir. 2009), *abrogated on other grounds by Skilling v. United States,* 561 U.S. 358 (2010)).

Further, even if the Sixth Circuit did recognize the exception, Stanley's argument lacks merit. "'Impeachment by contradiction permits courts to admit extrinsic evidence that specific testimony is false, because contradicted by other evidence.'" *Scott*, 693 F.3d at 721 (quoting *Kincaid-Chauncey*, 556 F.3d at 932). The extrinsic evidence Stanley seeks to introduce here is a driving assessment from a therapist from the University of Toledo Medical Center. But Stanley points to no specific *testimony* by Dr. Brue which he seeks to impeach. Instead, Stanley introduces the driving assessment to

5

impeach an email written by Dr. Brue in October 2011. (Doc. No. 30 at 14). Because there is no testimony at issue, impeachment by contradiction does not apply.

Lastly, the driving assessment does not contradict Dr. Brue's October 2011 email, which states, "Received additional medical information. Based on the information at this time he is able to work in an office setting performing paperwork or simple manual tasks." (Doc. No. 22-3 at 25). Stanley purports that this statement leads to the inference that the work restrictions included in the email were "based upon 'additional medical information'" received alone. (Doc. No. 30 at 14). That is not the case. The email simply states that Dr. Brue received the additional medical information, a fact corroborated by his notes in Stanley's medical records, (Doc. No. 22-3 at 19-20), and that the recommendations were "based on the information at this time." The information at the time included the additional medical information along with observations made Dr. Brue's personal return to work examination, which indicated the need for greater restrictions. Because Dr. Brue's email is supported by the record evidence, I find no contradiction which could be used to impeach.

Therefore, for the foregoing reasons, the driving assessment performed by the University of Toledo Medical Center therapist will not be admitted for the purpose of impeachment and must be stricken from the record.

## IV. MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the

6

movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

When considering a motion for summary judgment, all evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

BPPNA moves for summary judgment on both Stanley's race discrimination and disability discrimination claims. (Doc. No. 22). Stanley concedes "he has not been able to find a similarly situated non-African American and waives that argument." (Doc. No. 26 at 5). Therefore,

summary judgment is granted to BPPNA on this claim, leaving only Stanley's Ohio law disability discrimination claim contested.

In Ohio, an employer is prohibited from discriminating against an employee with respect to "any matter directly or indirectly related to employment" because of the disability of the employee. O.R.C. § 4112.02(a). Courts analyze Ohio disability discrimination claims in the same manner as federal ADA claims and apply the *McDonnell Douglas* burden-shifting framework. *See Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) ("In light of the fact that Ohio's disability discrimination law parallels the ADA in all relevant respects, we apply the same analytical framework, using cases and regulations interpreting the ADA as guidance in our interpretation of the OCRA."); *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 450 (6th Cir. 2007) (quoting *City of Columbus Civil Service Commission v. McGlone*, 82 Ohio St. 3d 569, 573 (1998)) ("Because '[t]he federal Americans with Disabilities Act ("ADA") is similar to the Ohio handicap discrimination law[,] .... [w]e can look to regulations and cases interpreting the federal Act for guidance in our interpretation of Ohio law.'"); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)).

Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). If the plaintiff is able to do so, the burden shifts to the employer to articulate some "legitimate, nondiscriminatory reason" for the action taken. *McDonnell Douglas*, 411 U.S. at 802; *Talley*, 542 F.3d at 1105. Finally, if the employer is able to put forth a legitimate business reason, the burden shifts back to the plaintiff to demonstrate that the reason is a mere pretext for discriminatory conduct. *See McDonnell Douglas*, 411 U.S. at 804-05; *Talley*, 542 F.3d at 1105.

A.  Prima Facie Case under O.R.C. § 4112.02

To succeed on a disability discrimination claim, Stanley must first establish a prima facie case by demonstrating

> (1) that he or she was [disabled], (2) that an adverse employment action was taken by an employer, at least in part, because the individual was [disabled], and (3) that the person, though [disabled], can safely and substantially perform the essential functions of the job in question.

*Wysong*, 503 F.3d at 451 (quoting *Hood v. Diamond Products, Inc.*, 74 Ohio St. 3d 298, 298 (1996)). While BPPNA concedes that the second element is satisfied, the first and third elements are disputed. Therefore, the two issues remaining are whether Stanley was disabled in August 2011 and whether Stanley could substantially perform the functions of his job in August 2011.

1.  Disabled

To satisfy the first element, an employee need not be *currently* disabled but could also be regarded as disabled or have a record of disability. O.R.C. § 4112.01(A)(13). "An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k); *see also Spence v. Donahoe*, 515 F. App'x 561, 570 (6th Cir. 2013). Contrary to BPPNA's argument that "there must be a misperception, stereotype, or other false belief by the employer" to find an employee has a record of disability, (Doc. No. 29 at 11), "[t]he 'plaintiff only needs to show that 'at some point in the past' he had [a substantially limiting impairment].'" *Spence*, 515 F. App'x at 570 (quoting *Knight v. Metropolitan Government of Nashville and Davidson County, Tenn.*, 136 F. App'x 755, 760 (6th Cir. 2005)).

In this case, the parties agree that Stanley was at one time substantially impaired because of the stroke, making him eligible for short-term and long-term disability benefits. Therefore, regardless of whether Stanley was actually disabled or regarded as disabled in August 2011, he had an undisputed record of disability. Stanley's record of disability satisfies the first element of the prima facie case of an Ohio disability discrimination claim.

Related to this issue is Stanley's outstanding motion to strike issues newly raised in BPPNA's reply brief. (Doc. No. 31). While a party may not *raise* an issue for the first time in a reply brief, it

9

may "*reply* to arguments made in the response brief." *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (quoting *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)). Here, I find BPPNA was merely replying to Stanley's allegation that he was not *actually* disabled when he attempted to return to work in August 2011. (Doc. No. 26 at 5, 23). Because BPPNA's reply was within the scope of Stanley's opposition arguments, Stanley's motion to strike is denied. (Doc. No. 31).

2. Substantial Performance of Essential Functions

The second element in dispute asks whether the employee could substantially perform the essential functions of the job, a determination made on a case-by-case basis "taking into consideration the specific job requirements and the individual disabled person's capabilities." O.A.C. § 4112-5-08(D)(4)(a)[1]. The essential functions of a job include only those tasks that are routinely performed. O.A.C. § 4112-5-08(D)(4)(b). While the ability to "substantially perform" those essential functions depends on whether the "person is capable of performing the job, with reasonable accommodation to his or her disability, at the minimum acceptable level of productivity applicable to a non-disabled incumbent employee." O.A.C. § 4112-5-08(D)(4)(d). Of relevance to the facts at hand, the Ohio Administrative Code provides,

> A physician's opinion on whether a person's disability substantially and inherently impairs his or her ability to perform a particular job will be given due weight in view of all of the circumstances including:
> (i) The physician's knowledge of the individual capabilities of the applicant or employee, as opposed to generalizations as to the capabilities of all persons with the same disability, unless the disability is invariable in its disabling effect;
> (ii) The physician's knowledge of the actual sensory, mental and physical qualifications required for substantial performance of the particular job; and
> (iii) The physician's relationship to the parties.

O.A.C. § 4112-5-08(D)(4)(e).

---

[1] Although Ohio Administrative Code Section 4112-5-08(D)(4) is generally applicable to employers seeking to prove a legitimate reason for discrimination, the regulation lends guidance as to how the element itself should be interpreted as well.

Stanley does not dispute what the essential functions of the job were, nor does he contend he needed an accommodation to perform those essential functions. Instead, he asserts that when he attempted to return to work in August 2011, he could perform the essential functions of his job "with no restrictions." (Doc. No. 26 at 19). To support the assertion, Stanley relies only on the return-to-work slip issued by Nurse Practitioner Scardina. But both Dr. Brue and Dr. Smallwood disagreed with the recommendation.

The first factor listed is especially important because of the nature of Stanley's injury, a stroke. Dr. Brue opined that most recovery occurs within the first year after a stroke. (Doc. No. 36 at 11). But the speed of recovery and ability to recover is unique to every stroke victim and depends on factors such as the extent of the stroke, treatments used, and rehabilitative services provided. (Doc. No. 36 at 11; Doc. No. 37 at 6). As Dr. Smallwood stated, "the brain is a very complicated piece of machinery….You don't know how it's going to react after it's been damaged, so time is the one thing that will tell you what's going to happen." (Doc. No. 37 at 6). Because "injury to the brain can cause both cognitive, as well as musculoskeletal, motor sensory deficits," Dr. Brue emphasized the importance of neurological tests to determine whether any area associated with the stroke impacts the ability to perform job duties. (Doc. No. 36 at 15).

Dr. Brue examined Stanley using physical and neurological tests designed to evaluate whether Stanley could perform his job duties after he suffered his stroke just nine months prior. While Nurse Practitioner Scardina also examined Stanley around the same time period, Dr. Smallwood confirmed that she did not perform any neurological tests to assess cognitive impairment, instead conducting a purely physical examination. (Doc. No. 37 at 9). Dr. Smallwood did not personally examine Stanley before making his recommendation. But after review of Stanley's medical record, including the notes taken by Nurse Practitioner Scardina, he did not endorse her conclusion, but instead recommended work restrictions and long-term disability. (Doc. No. 37 at 10, 12, 14).

11

With respect to the second factor, Dr. Brue and Dr. Smallwood both had an understanding of Stanley's job duties when making their recommendations. But each noted that Nurse Practitioner Scardina did not, as evident by her mischaracterization of Stanley's job as working in a factory operating valves. (Doc. No. 22-3 at 19-20; Doc. No. 37 at 10).

The final factor examines the relationship between the physician and the parties. But this factor plays little relevance here as both Stanley's primary care physician, Dr. Smallwood, and BPPNA's contracted physician, Dr. Brue, both concluded Stanley was not able to return to work.

Considering all of the factors, I find Nurse Practitioner Scardina's return-to work slip alone, without more, is insufficient to create a genuine dispute of material fact. The note is a simple form with "Aug 23 2011" written on the blank next to "Patient can return to work/school on: Date." (Doc. No. 22-3 at 24). The conclusion is not substantiated by any additional objective evidence in the record. In fact, based on the same findings, Dr. Smallwood came to the conclusion that Stanley was not able to return to work. Additionally, Stanley presents no evidence to affirm his claim that Nurse Practitioner Scardina did have knowledge of his job duties. Because Stanley puts forth no facts to demonstrate he was able to perform the essential functions of his job in August 2011 contrary to Dr. Brue and Dr. Smallwood's medical opinions, I find no genuine dispute of material fact. Therefore, Stanley cannot demonstrate all of the elements required to establish a prime facie case.

B.  Pretext

Even if Stanley could establish a prima facie case of disability discrimination, his claim would ultimately fail. BPPNA's reliance on Dr. Brue and Dr. Smallwood's medical opinions that Stanley was not able to return to work is a legitimate, nondiscriminatory reason for not allowing him to do so in August 2011. *See, e.g.*, *Hood*, 74 Ohio St. 3d at 302 ("Legitimate, nondiscriminatory reasons for the action taken by the employer may include…the inability of the employee or prospective employee to safely and substantially perform, with reasonable accommodations, the essential

functions of the job in question."); Ohio Administrative Code 4112-5-08(D)(4). Therefore, the burden shifts back to Stanley to demonstrate BPPNA's reason is merely "a pretext for impermissible discrimination." *Hood*, 74 Ohio St. 3d at 302 (citing *Plumbers & Steamfitters Joint Apprenticeship Committee v. Ohio Civil Rights Commission*, 66 Ohio St. 2d 192, 198 (1981)).

Pretext may be demonstrated "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Generally, a plaintiff may establish pretext by showing "that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000) (citing *Manzer v. Diamond Shamrock Chemical Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Here, Stanley offers several theories to show pretext.

First, Stanley claims that BPPNA manipulated Dr. Smallwood into agreeing that Stanley could not perform the essential functions of his job.[2] But this theory is supported by speculation and hearsay, not fact.[3] Steve Rodzos, a BPPNA employee and union member, called Dr. Smallwood's office to solicit

> a statement from Smallwood to Brue that would convince Brue [Stanley] could go back to work and make a living, or, B, Smallwood agrees that Brue's correct and [Stanley] cannot go back to work and he makes money through LTD [long-term disability].

---

[2] Relying on the theory of manipulation, Stanley offers a fourth theory that BPPNA promptly returned him to work after the alleged manipulation was discovered. To support this argument, Stanley states, "A reasonable jury might find Mark Harber's reminder to all that 'to be consistent with our past practices,' Mr. Stanley had to be checked out on all the surveillance testing. I [sic] reasonable juror might find the conversation, suggestive of guilty conscience." (Doc. No. 26 at 23). I find this argument to be unsupported by any record evidence and rooted in mere speculation alone.

[3] In his opposition, Stanley states, "Mr. Rodzos admitted to Mr. Lowry that he called Dr. Smallwood's office in order to get LTD for Mr. Stanley, even though as the HR Manager defending Mr. Stanley's grievance, he very well knew that Mr. Stanley did not want LTD." (Doc. No. 26 at 22). The first portion of this statement is textbook hearsay and may not be relied upon for purposes of summary judgment. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) ("[H]earsay evidence cannot be considered on a motion for summary judgment."). The second portion of the statement is an assumption put forth as fact, with no record evidence in support.

13

(Doc. No. 38 at 7). In an attempt to resolve Stanley's financial hardships at the time, Rodzos stated he did not care whether Dr. Smallwood recommended long-term disability or returning to work so long as Stanley started receiving some money. *Id.* In response, Dr. Smallwood issued the letter enumerating Stanley's work restrictions and recommending long-term disability, accurately reflecting his medical opinion of Stanley's condition at the time. ((Doc. No. 22-4 at 18, Doc. No. 37 at 12, 14). Because Stanley introduces no evidence that his primary care physician falsely represented his work restrictions, this theory must fail.

Second, Stanley alleges BPPNA failed to place him in a position which would accommodate his restrictions contrary to BPPNA's assertion that no such position was available. But, "to overcome summary judgment, the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position." *Kleiber v. Honda of America Manufacturing, Inc.*, 485 F.3d 862, 870 (6th Cir. 2007). Since Stanley fails to identify any vacant job he was qualified to perform, he may not succeed on this theory of pretext.

Finally, Stanley argues that Dr. Brue wrongfully disregarded the opinions of the nurse practitioner, stating Dr. Brue "would have found some fault with any opinion that Mr. Stanley was qualified to return." (Doc. No. 26 at 23). But I find this theory contrary to the record evidence in that Dr. Brue sought out the additional medical information to compare to his own findings and resolve any discrepancy. Physicians regularly come to different conclusions when examining the same patient. A differing medical opinion, without more, is not indicative of pretext. Stanley fails to introduce any record evidence to suggest Dr. Brue's medical opinion was a pretext. Because Stanley's theories of pretext are not supported by any evidence in the record, there is no genuine issue of material fact and all must fail.

V. CONCLUSION

For the foregoing reasons, Defendant BPPNA's motion for summary judgment is granted as to both claims. (Doc. No. 22). While I found it unnecessary to rule in full on Defendant's motion

to strike inadmissible evidence submitted with Plaintiff's Opposition to Defendant's motion for summary judgment, the University of Toledo Medical Center driving assessment at issue is stricken from the record. (Doc. No. 28). Finally, Plaintiff's motion to strike issues newly raised in reply is denied. (Doc. No. 31).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge